UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| DAVID WALSH, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>WILLIAM MITCHELL, DONNA )<br>MITCHELL, JOHN JELICH, )<br>DENNIS MICHAEL ROGERS, )<br>and AMY SIMS )<br>Defendants. ) | Case No.: DKC-08-CV-1897 |

## FIRST AMENDED COMPLAINT

Plaintiff David Walsh ("Walsh"), by and through his attorneys, complains of the Defendants William Mitchell, Donna Mitchell, John Jelich, Dennis Michael Rogers, and Amy Sims as follows, for damages caused to him by their violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, Trover, Conversion, Breach of Contract, Breach of Fiduciary Duty, Civil Conspiracy, Unjust Enrichment, and Assault and Battery, and in support here states:

### I. PARTIES, JURISDICTION AND VENUE

1. Plaintiff David Walsh is a citizen of Maryland.

2. Defendants William Mitchell ("Mitchell") and Donna Mitchell ("Donna Mitchell") (collectively referred to herein as "the Mitchells") are citizens of Maryland.

3. Defendant John Jelich ("Jelich") is a citizen of Maryland.

4. Defendant Dennis Michael Rogers ("Rogers") is a citizen of Maryland.

5. Defendant Amy Sims ("Sims") is a citizen of Maryland.

6. This is a RICO action conferring this Court subject matter jurisdiction pursuant to RICO's civil suit provision, 18 U.S.C. § 1964(c). Jurisdiction is also vested in this Court by virtue of 28 U.S.C. § 1331.

7. Because claims brought under Maryland law are so related to Walsh's federal claims, over which the Court has original jurisdiction that they form part of the same case or controversy, the Court has supplemental jurisdiction over Walsh's Maryland common law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this District as many of the facts occurred here and the parties reside here.

## II. FACTUAL BACKGROUND OF ALL CLAIMS

9. In the aftermath of Hurricane Katrina, a multitude of vehicle owners in the Gulf Area made claims against their auto insurance policies for car damage sustained during the hurricane. In settling these claims, it was not uncommon for a policyholder to transfer title of an insured vehicle to his or her insurance company in exchange for policy benefits.

10. As a result of Hurricane Katrina, the wholesale auto market experienced a glut of used vehicles. Many of these vehicles sustained little or no actual damage in the hurricane and could be purchased by knowledgeable buyers on the wholesale market, repaired for a modest investment, transferred to a geographic area with less supply of used vehicles, and sold for substantial profit.

11. Walsh decided to buy some of the Hurricane Katrina vehicles for his personal use and for the use of his family. Walsh hired Mitchell to transport these cars to Walsh's home in

January 2006. In the beginning, Walsh did not perceive the used car market as an investment opportunity.

12. Unbeknownst to Walsh, Mitchell was a career criminal with a history of theft and saw a venture with Walsh as an opportunity to steal more cars. During January 2006, Mitchell discussed his personal business with Walsh. Then, in or about February 2006, Mitchell contacted Walsh about going into business together selling used cars.

13. To that end, Mitchell devised a scheme to steal Walsh's vehicles with the help of his co-conspirators ("the Scheme"). As part of the Scheme, Mitchell entered into two partnership agreements with Walsh for the purchase and resale of used vehicles on February 22, 2006 and March 10, 2006. Pursuant to these partnership agreements, Walsh purchased used vehicles from Copart Auctions (and other vendors) in Florida, Louisiana, Mississippi, and Washington, D.C. Mitchell would then transport these vehicles from the auction site locations to his repair shops in Maryland, at which time the vehicles were serviced/repaired, and then resold. Pursuant to these partnership agreements, Walsh and Mitchell were supposed to split the profits equally.

14. Under the guise of a legitimate partnership, Mitchell was able to misrepresent the true nature of his intended illegal activities to Walsh—the theft and transportation of Walsh's vehicles. This caused Walsh to finance these vehicle acquisitions by, *inter alia*, wire transferring cash into Mitchell's personal checking account, wire transferring cash into Mitchell's Copart's business account (located in California), and/or by charging Walsh's credit card. As a result of Mitchell's deception of Walsh, Walsh advanced over $300,000 to purchase cars. Mitchell obtained, transported, and sold the cars, but did not give Walsh his share of the proceeds.

15. Mitchell's Scheme to steal Walsh's vehicles began in or about January 2006 and has continued through the present. During this time Walsh purchased approximately 40 vehicles and then they were stolen and transported by Mitchell and his co-conspirators.

16. At all relevant times during their relationship, Mitchell intended to deprive Walsh of all money from the resale of these vehicles, or to keep the vehicles for his own personal use without compensating Walsh.

17. The other Defendants are co-conspirators who cooperated with Mitchell to facilitate the Scheme to steal and transport Walsh's vehicles.

### III. THE RICO PREDICATE ACTS COMMITTED AGAINST WALSH

#### A.   Interstate Transportation of Stolen Cars

18. Mitchell's actions violated § 18 U.S.C. § 2312, and § 2313, which state, in pertinent part:

> Whoever transports in interstate or foreign commerce a motor vehicle, vessel, or aircraft, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both.
>
> …
>
> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any motor vehicle, vessel, or aircraft, which has crossed a State or United States boundary after being stolen, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both.

19. These statutes are made RICO predicate acts by 18 U.S.C. § 1961(1).

20. Each of the approximately 40 vehicles was stolen from Walsh because he was either deprived of the money Mitchell obtained from the resale of these vehicles or because the vehicles were never returned to Walsh. Nor was Walsh compensated in any way for these vehicles. The vehicles were concealed from Walsh despite numerous requests by Walsh to see the vehicles and titles. Thus, each car stolen from Walsh inflicted a separate injury to him.

21. As described above, Mitchell transported each of the vehicles he stole across state lines from Florida, Louisiana, Mississippi, or Washington, D.C., to Maryland, where they were serviced/repaired in preparation for resale. The vehicles were either resold to customers by the Defendants, personally retained by Defendants, and/or have otherwise been unaccounted for.

22. As part of the Scheme, Mitchell intended to steal these vehicles when he entered into the partnership agreements with Walsh and at all other relevant times.

### B.    Wire Fraud

23. Additionally, Mitchell's intentional misrepresentations about the true nature of his business dealings with Walsh resulted in Walsh transmitting money to Mitchell's Copart account in California, via interstate wires, which he would not have otherwise done. This violated 18 U.S.C. § 1343, another RICO predicate act pursuant to 18 U.S.C. §1961(1), which states, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

24. At the time Mitchell deceived Walsh into doing business with him, Mitchell could foresee and intended that Walsh would use interstate wires to transmit money in furtherance of the Scheme. Thus, Walsh alleges Mitchell violated 18 U.S.C. § 1343.

## IV. THE RICO PREDICATE ACTS AGAINST OTHER VICTIMS

25. Mitchell and his co-conspirators have victimized others in the same manner as Walsh, comprising a ten-year pattern of racketeering activity commencing in 1999 and still ongoing. These other victims include (but are not limited to):

### A. Geico Insurance Company Is A Victim

26. In 1999, in Prince George's County, Maryland, Mitchell attempted to illegally obtain possession of a stolen 1994 Gold Honda Accord by registering a falsified Mechanic's Lien on the vehicle. This violated 18 U.S.C. §§ 2312, 2313, which are RICO predicate acts.

27. Mitchell stored and concealed the stolen Gold Honda Civic at Nate's Auto Repair Shop, on U.S. Rt. 1, Cherry Lane, in Laurel, Maryland.

28. The vehicle was originally stolen from an individual in Washington, D.C. on September 4, 1994. After it was reported stolen, Geico Insurance Company, the victim, obtained ownership of the vehicle. The vehicle was valued at approximately $18,000.

29. Mitchell was charged in Maryland state court for theft and unlawful taking of a motor vehicle.

### B. Ourisman Chevrolet and the Monfridas are Victims

30. In 2000, Mitchell and Amy Sims knowingly obtained a stolen 2000 Chevrolet Malibu (VIN 1G1ND52J4Y6346286). The vehicle was stolen from Ourisman Chevrolet, one of the victims, located in Temple Hills, Maryland.

31. In 2000, Mitchell also purchased a salvaged 2000 Chevrolet Malibu (VIN 1G1ND5217Y6183914) from Jelich. Jelich had purchased the salvaged 2000 Chevrolet Malibu at the Bel-Air Auto Auction.

32. Mitchell and Sims transported the stolen 2000 Chevrolet Malibu from Maryland to Virginia, "re-plated" it with the VIN from the salvaged 2000 Chevrolet Malibu provided by Jelich, and brought the vehicle back to Maryland with a "clean" Virginia title. The Virginia State Police discovered this after Mitchell and Sims titled the vehicle in Virginia in an attempt to conceal its identity.

33. Mitchell and Sims then sold the re-plated stolen 2000 Chevrolet Malibu to Victor and Becky Monfrida, other victims. This violated 18 U.S.C. §§ 2312, 2313, and 2321,[1] RICO predicate acts.

34. The stolen, re-plated 2000 Chevrolet Malibu was seized by the Police. Mitchell and Sims were charged under Maryland law with, *inter alia*, theft and unlawful taking of a motor vehicle. Mitchell pleaded *nolo contendere* and served 30 days in jail.

## V. COUNT I AGAINST WILLIAM MITCHELL FOR VIOLATIONS OF 18 U.S.C. 1962(c)

35. The proceeding paragraphs are incorporated herein as though set forth in full.

36. Mitchell violated 18 U.S.C. § 1962(c), as described below.

37. At all relevant times Mitchell Enterprises Xtreme Stat was a corporation operated by Mitchell and his wife Donna Mitchell which affected interstate commerce. As such, it is a RICO enterprise pursuant to 18 U.S.C. §§ 1961(4).

    a. Mitchell is a "person," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

    b. Mitchell committed a pattern of racketeering activity, consisting of repeated and continuous violations of 18 U.S.C. §§ 2312, 2313, and 1343 through his

---

[1] 18 U.S.C. § 2321, states, in relevant part: "Whoever buys, receives, possesses, or obtains control of, with intent to sell or otherwise dispose of, a motor vehicle or motor vehicle part, *knowing that an identification number for such motor vehicle or part has been removed, obliterated, tampered with*, or *altered*, shall be fined under this title or imprisoned not more than ten years, or both." (emphasis added). Like §§ 2312 and 2313, 18 U.S.C. § 2321 is also a RICO predicate act.

       participation in Mitchell Enterprises Xtreme Stat.  He began his racketeering activity in 1999, and it is still open and ongoing.

38. Each episode of transporting a stolen vehicle at issue here constitutes a separate violation of § 2312 and/or §2313, and therefore a separate RICO violation.  Between 1999 and the present, Mitchell committed over 40 RICO violations, the number of vehicles stolen and transported across state lines.

39. Additionally, the misrepresentations Mitchell made to Walsh which caused Walsh to transmit money via interstate wires, are additional RICO violations.

40. Mitchell's violations of §§ 2312, 2313, and 1343, enumerated above in paragraphs 12 through 24, proximately damaged Walsh in his business or property, pursuant to 18 U.S.C. § 1964(c), in excess of $300,000.00.

41. Walsh suffered damages to the extent he (among other things): (a) acquired vehicles that were never titled in his name; (b) did not receive the proceeds of sales of his vehicles; (c) expended money and labor to repair vehicles without receiving the proceeds of any sales; and (d) was deprived of the value and use of these vehicles.

42. WHEREFORE, Walsh demands judgment against Mitchell for threefold these damages, his costs and attorney's fees, and an injunction against Mitchell from further RICO violations, dissolution of the enterprise, ordering his divestment of any interests he has in any business entities, and any other relief deemed just, pursuant to 18 U.S.C. § 1964(a). Walsh also requests a jury trial.

### VI. COUNT II AGAINST MITCHELL, DONNA MITCHELL, JELICH, ROGERS, AND SIMS FOR RICO CONSPIRACY

43. The proceeding paragraphs are incorporated herein as though set forth in full.

44. Mitchell relied upon Donna Mitchell, Jelich, Rogers, and Sims to cooperate in committing the RICO violations against Walsh, through Mitchell Enterprises Xtreme Stat (the RICO enterprise), as detailed below. As such, each of the Defendants violated 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. § 1962(c).

45. As part of the conspiracy, Donna Mitchell assisted Mitchell in arranging transportation, storing, and arranging buyers for Walsh's stolen vehicles; she purposely misled Walsh about the illicit nature of the enterprise so as to conceal the ongoing Scheme; she placed false newsprint and internet advertisements to make it appear that Walsh's vehicles were not yet sold; she submitted false invoices to Walsh; she processed false charges on Walsh's credit cards; she purposely delayed providing accurate details about the status, payment, and sale of the vehicles to hinder Walsh's recovery of either the money or the vehicles; she received title of the stolen vehicles in her name; she released title when the vehicles were sold; and she used Walsh's stolen vehicles for her own personal use.

46. As part of the conspiracy, Jelich assisted Mitchell in transporting, storing, and arranging buyers for Walsh's stolen vehicles; he stored titles to Walsh's vehicles at his auto shop; and he used Walsh's stolen vehicles for his own personal use. Additionally, Jelich worked closely with Mitchell in the past and knew that he was a criminal.

47. In June 2006, Walsh told Jelich and Rogers about the partnership with Mitchell, that he [Walsh] purchased the cars at issue, and that he [Walsh] was concerned about recovering his money. Jelich sarcastically responded, "Good luck with that." Later that day, Mitchell and Jelich discussed a joint venture to purchase real estate together, in which Mitchell would use the money obtained from Walsh's stolen vehicles to purchase his share.

48. As part of the conspiracy, Rogers assisted Mitchell in transporting, storing, and arranging buyers for Walsh's stolen vehicles; and he used Walsh's stolen vehicles for his own personal use. Rogers worked closely with Mitchell in the past and knew that he was a criminal.

49. As part of the conspiracy, Sims assisted Mitchell in arranging for transportation and buyers for Walsh's stolen vehicles; she purposely misled Walsh about the illicit nature of the enterprise so as to conceal the ongoing Scheme; she falsified information related to the status, sale, and payment of the vehicles; she provided Walsh with false information regarding the location of the stolen vehicles; she purposely delayed providing accurate details about the status of the vehicles to hinder Walsh's recovery of either the money or the vehicles; and she used Walsh's stolen vehicles for her own personal use.

50. At all relevant times, the Mitchells, Jelich, Rogers, and Sims knew that the vehicles in question were stolen.

51. As a direct and proximate result of and by reason of their agreement with Mitchell to commit the RICO predicate acts alleged through Mitchell Enterprises Xtreme Stat, Walsh has been injured in his business or property, within the meaning of 18 U.S.C. § 1964(c), in an amount in excess of $300,000.00, the amount of money that he paid for the purchase and repair of the vehicles.

52. Walsh suffered damages to the extent he (among other things): (a) acquired vehicles that were never titled in his name; (b) did not receive the proceeds of sales of his vehicles; (c) expended money and labor to repair vehicles without receiving the proceeds of any sales; and (d) was deprived of the value and use of these vehicles.

53. WHERFORE, Walsh is entitled to recover against Mitchell, Donna Mitchell, Jelich, Rogers, and Sims threefold his damages sustained, with costs, and attorneys' fees, and an injunction against the Defendants from further RICO violations, dissolution of the enterprise, ordering their divestment of any interest they have in any business entities, and any other relief deemed just, pursuant to 18 U.S.C. §1964(a).  Mitchell, Donna Mitchell, Jelich, Rogers, and Sims are jointly and severally liable for all damages.  Walsh also requests a jury trial.

### VII. COUNT III AGAINST MITCHELL, DONNA MITCHELL, JELICH, ROGERS, AND SIMS FOR CONSPIRACY TO COMMIT TROVER AND CONVERSION

54. The preceding paragraphs are incorporated herein as though set forth in full.

55. The Mitchells agreed to assist in the sale of certain motor vehicles paid for and owned by Walsh.

56. Sims, Rogers, and Jelich agreed to assist the Mitchells in receiving and/or removing vehicles owned by Walsh.

57. Walsh demanded the return of his property or the alternate value of the property, but the Mitchells refused Walsh's demands. The Defendants' retention of the vehicles was intentional, without justification, and constituted conversion of Walsh's property.

58. WHEREFORE, Walsh demands judgment against the Defendants for compensatory damages in excess of $300,000.00 with interest and costs, and such other relief as this Court may deem proper.  Walsh also requests a jury trial.

## VIII. COUNT IV AGAINST MITCHELL AND DONNA MITCHELL FOR BREACH OF CONTRACT

59. The Mitchells individually and jointly were engaged in the business of buying, selling and repairing automobiles.

60. As described in paragraph 13, Walsh entered into a contract with the Mitchells by which Walsh purchased automobiles and automobile parts for resale in the retail and wholesale market.

61. Walsh funded the purchase of the automobile and automobile parts which were (contrary to the contract between the Mitchells and Walsh) subsequently disposed of and/or exclusively utilized by the Mitchells without compensating Walsh.

62. Walsh demanded payment under the terms of the contract and the Mitchells refused and/or failed to pay the balance due thus materially breaching the contract with Walsh.

63. As a result of their breach Walsh incurred damages in excess of $300,000.00.

64. WHEREFORE, Walsh demands judgment against the Mitchells jointly and severally for more than $300,000.00 with interest and cost and for such other relief as the Court may direct. Walsh also requests a jury trial.

## IX. COUNT V AGAINST MITCHELL AND DONNA MITCHELL FOR BREACH OF FIDCUIARY DUTY

65. As detailed above, the Mitchells and Walsh entered into a partnership for the sale of used cars. Pursuant to the Maryland Revised Uniform Partnership Act, Title 9A-101 *et. seq.*, the Mitchells and Walsh owed a fiduciary duty to one another.

66. By stealing the vehicles, failing to account for the vehicles' sales, location and/or transportation, and by deliberately impeding Walsh's ability to account for said actions, as detailed above, the Mitchells violated their fiduciary duty to Walsh.

67. WHEREFORE, Walsh demands the following relief against the Mitchells: an accounting of profits, losses, and costs; reimbursement for costs and payments; a constructive trust; and any other equitable relief the Court deems proper.

### X. COUNT VI AGAINST MITCHELL, DONNA MITCHELL, JELICH, ROGERS, AND SIMS FOR CIVIL CONSPIRACY

68. Defendants Mitchell, Donna Mitchell, Jelich, Rogers, and Sims entered into an agreement to wrongfully take and use automobiles and automobile parts purchased by Walsh.

69. Without the consent or approval of Walsh, on or about January 2006 and thereafter, Defendants unlawfully transferred, utilized and/or sold automobiles and automobile parts purchased by Walsh.

70. As a result of the Defendants' conspiracy to acquire and dispose of automobile and automobile parts, Walsh was damaged, including severe economic injury, loss profits and other compensatory damages totaling more than $300,000.00.

71. WHEREFORE Plaintiff demands judgment against the Defendants Mitchell, Donna Mitchell, Jelich, Rogers, and Sims, who are jointly and severally liable for compensatory damages of more than $300,000.00, plus interest and costs. Walsh also requests a jury trial.

### XI. COUNT VII AGAINST JELICH, ROGERS, AND SIMS FOR UNJUST ENRICHMENT

72. Walsh did not enter into a contract or partnership with Defendants Jelich, Rogers, or Sims.

73. As detailed above, Jelich, Rogers, and Sims used Walsh's vehicles for their own personal use without compensating Walsh. This was a benefit for which they were not entitled.

74. The acceptance or retention by these Defendants of the benefit under the circumstances makes it inequitable for them to retain the benefit without payment for its value.

75. WHEREFORE, Plaintiff demands judgment against Defendants Jelich, Rogers, and Sims for the value of the use of Walsh's vehicles and any other equitable relief the Court deems proper.

### XII. COUNT VIII AGAINST MITCHELL FOR ASSAULT AND BATTERY

76. On May 22, 2007 Mitchell threatened and assaulted Walsh by ejecting him from the Mitchells' place of business. At all times relevant hereto, Mitchell acted with the intent and did do bodily harm to Walsh. Mitchell's conduct was perpetuated with actual malice and caused Walsh to be put into reasonable apprehension for his life. Mitchell also left threatening voicemails regarding the same.

77. Mitchell also made threatening racial comments saying, "You White Mother Fucker, come over to my shop and I will take care of you!" and "You white people if you had anything on me [Mitchell] you [Walsh] would have done something a long time ago."

78. At the same time and place aforesaid, Mitchell violently struck the Plaintiff. Defendant Mitchell's actions constituted an intentional touching which was of a non-consensual nature and was undertaken deliberately and which constitutes actual malice.

79. As a result of Mitchell's conduct, Walsh sustained substantial damages including, but not limited to, extreme pain and suffering, physical injuries including but not limited to back, neck, head and shoulders, humiliation, mental distress and monetary losses.

80. WHEREFORE, Walsh demands judgment against Defendant William Mitchell of an amount in excess of $75,000.00 in compensatory damages and $100,00.00 punitive damages with interest and cost. Walsh also requests a jury trial.

Dated: March 9, 2009               Respectfully submitted,

                                   /s/ William J. Howard
                                   Bar No. 25381
                                   Howard & Marcus
                                   4316 Hamilton Street
                                   Hyattsville, MD  20781
                                   (301) 864-6700

**CERTIFICATE OF SERVICE**

    I, William Howard, an attorney, state that I caused the foregoing document to be served upon all counsel of record via electronic delivery by CM/ECF on this the 9th day of March, 2009.

| | |
|---|---|
| Dated: March 9, 2009 | /s/ William J. Howard |
| | Bar No. 25381 |
| | Howard & Marcus |
| | 4316 Hamilton Street |
| | Hyattsville, MD  20781 |
| | (301) 864-6700 |