UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| DAVID WALSH, | ) |
| | ) |
| Plaintiff, | ) Case No.: DKC-08-CV-1897 |
| | ) |
| v. | ) |
| | ) |
| WILLIAM MITCHELL, DONNA MITCHELL, JOHN JELICH, DENNIS MICHAEL ROGERS, and AMY SIMS | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

Plaintiff David Walsh ("Walsh"), by and through his attorneys, complains of the Defendants, William Mitchell, Donna Mitchell, John Jelich, Dennis Michael Rogers, and Amy Sims, as follows, for damages caused to him by their violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, Trover, Conversion, Breach of Contract, Breach of Fiduciary Duty, Civil Conspiracy, Unjust Enrichment, Assault and Battery, and Fraudulent Misrepresentation, and in support here states:

### I. PARTIES, JURISDICTION AND VENUE

1. Plaintiff David Walsh is a citizen of Maryland.

2. Defendants William Mitchell ("Mitchell") and Donna Mitchell ("Donna Mitchell") (collectively referred to herein as "the Mitchells") are citizens of Maryland.

3. Defendant John Jelich ("Jelich") is a citizen of Maryland.

4. Defendant Dennis Michael Rogers ("Rogers") is a citizen of Maryland.

5. Defendant Amy Sims ("Sims") is a citizen of Maryland.

6. This is a RICO action conferring this Court subject matter jurisdiction pursuant to RICO's civil suit provision, 18 U.S.C. § 1964(c). Jurisdiction is also vested in this Court by virtue of 28 U.S.C. § 1331.

7. Because claims brought under Maryland law are so related to Walsh's federal claims, over which the Court has original jurisdiction that they form part of the same case or controversy, the Court has supplemental jurisdiction over Walsh's Maryland common law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this District as many of the facts occurred here and the parties reside here.

## II. FACTUAL BACKGROUND OF ALL CLAIMS

9. In the aftermath of Hurricane Katrina, a multitude of vehicle owners in the Gulf Area made claims against their auto insurance policies for car damage sustained during the hurricane. In settling these claims, it was not uncommon for a policyholder to transfer title of an insured vehicle to his or her insurance company in exchange for policy benefits.

10. As a result of Hurricane Katrina, the wholesale auto market experienced a glut of used vehicles. Many of these vehicles sustained little or no actual damage in the hurricane and could be purchased by knowledgeable buyers on the wholesale market, repaired for a modest investment, transferred to a geographic area with less supply of used vehicles, and sold for substantial profit.

11. Originally, Walsh decided to buy some of the Hurricane Katrina vehicles for his personal use and for the use of his family that are not the subject of this Complaint.

12. Walsh met Mitchell at the end of December 2005. Then, sometime between January 5, 2006 and January 13, 2006, Mitchell and Walsh discussed the possibility of Walsh purchasing additional used cars on the wholesale market that had survived Hurricane Katrina as a personal investment.

13. At this time, Mitchell told Walsh that he had a retail license to sell vehicles in Maryland. In fact, Mitchell only had a wholesale license.

14. Unbeknownst to Walsh, Mitchell was a career criminal with a history of theft and saw Walsh as an opportunity to steal more cars.

### A. The Copart Scheme[1]

15. On February 22, 2006, Walsh entered into a contract with Mitchell so Mitchell could act as Walsh's agent in transporting and selling Walsh's Copart cars.

16. The details of the contract are as follows: Walsh paid Mitchell $5,000 for the right to use Mitchell Enterprises Xtreme Stat's (Mitchell's Corporation) Copart (and/or other vendor) login ID/password in order for Walsh to personally bid on used vehicles (from February 2006 through June 30, 2006) located in Florida, Louisiana, Mississippi, and Washington, D.C. If a bid was successful, then Walsh would wire the purchase price from his personal Bank of America account to the Copart account (or other vendors as applicable) to purchase the vehicle(s). Then, Walsh would pay Mitchell a fee to transport (or arrange for transport) Walsh's Copart Cars from the auction site (always out of state) to Walsh in Maryland. If requested by Walsh, Walsh would also pay Mitchell a fee to perform minor repair work on each vehicle he had transported to Maryland. Mitchell would then act as Walsh's sales agent to try to sell Walsh's Copart Cars because Mitchell claimed to have

---

[1] The cars involved in Subparagraph A ("Copart Scheme") will be hereafter referred to as the "Copart Cars."

- 3 -

buyers lined up. To the extent that Mitchell could successfully sell a Copart Car, Walsh would obtain the money from the sale and then split the profits with Mitchell, if any.

17. At all relevant times, Walsh owned each Copart Car and had legal right to posses these cars immediately. At no time did any of the Defendants own these cars, bid on these cars, or pay for these cars.

18. Walsh had sole authority for determining whether his Copart Cars were sold, who they were sold to, how much they sold for, and/or whether he [Walsh] would retain possession and title.

19. Mitchell, however, did not transport Walsh's Copart Cars from the auction sites to Walsh's home or to other locations selected by Walsh. Instead, he took possession of the Copart Cars at the auction sites and then transported them to several unauthorized locations, all in Maryland. Mitchell was not forthcoming about where Walsh's Copart Cars were located and he concealed them from Walsh, despite numerous requests from Walsh.

20. Thereafter, Mitchell and his co-conspirators sold many of Walsh's Copart Cars and kept the proceeds or simply kept the Copart Cars, which were stored in places unknown to Walsh.

21. Walsh never received his Copart Cars and Mitchell never titled any of the Copart Cars in Walsh's name, as he was supposed to do.

22. There are approximately 20 vehicles that are at issue in the Copart Scheme. The Copart Scheme began on approximately February 22, 2006 and has continued through the present. Despite repeated requests, to this day, Mitchell and the other Defendants, refuse to account for the whereabouts of any of Walsh's Copart Cars.

23. At all relevant times during their relationship, Mitchell intended to steal the Copart Cars from Walsh.

24. Walsh spent approximately $ 230,000.00 on the Copart Cars. The Copart Cars are the subject of Walsh's RICO claims.

### B. The Partnership Scheme[2]

25. On or about March 10, 2006, Mitchell and Walsh entered into a partnership agreement to purchase, repair and sell used cars on a "50/50" basis. Pursuant to the partnership agreement, Mitchell would locate the used cars to purchase; Mitchell would then notify Walsh in writing about the details of these cars (VIN, titles, make, model, year, approximate value); Walsh would have the option to approve or reject any proposed purchase; any cars approved by Walsh would be purchased by Mitchell; Mitchell would then charge Walsh for half of the amount of the purchase price; Mitchell and Walsh would split the proceeds "50/50."

26. None of the cars at issue in the Partnership Scheme were Copart Cars.

27. Pursuant to the Partnership Scheme, Mitchell, and his co-conspirators (the other Defendants) supposedly purchased 22 cars.

28. Mitchell and his co-conspirators faxed Walsh invoices for half the cost of the 22 Partnership Cars, listing only the make and model (and not the other requested information).

29. On information and belief, Mitchell never actually purchased any of the 22 Partnership Cars. On information and belief, the list of 22 Partnership Cars faxed to Walsh was falsified to induce Walsh to pay Mitchell and his co-conspirators.

---

[2] The cars involved in Subparagraph B ("Partnership Scheme") will be hereafter referred to as the "Partnership Cars."

30. Walsh paid Mitchell $46,000, which was allegedly half the cost of the 22 Partnership Cars, on the condition that Mitchell would provide all the requested information (VIN, titles, make, model, year). Mitchell never provided this information to Walsh.

31. At no time did Mitchell ever show any of the Partnership Cars to Walsh.

32. Despite repeated requests, Walsh has never seen any of the Partnership Cars, has never received the requested VINs, titles or other requested information, and has never received any money from them.

33. The Partnership Cars are <u>not</u> the subject of Walsh's RICO claims.

34. The following is a list of Partnership Cars that the Mitchells sent to Walsh for which Walsh paid half the alleged cost: '01 Jaguar, '05 Chrysler, '01 GMC Yukon, '03 Corvette, '01 Corvette, '01 Mercedes, '97 Ford, 01 Dodge, '66 Mercedes, '91 Ford, '01 Saturn, '01 Mazda, '99 BMW, '00 Cadillac, '01 BMW, '01 Saturn, '01 Corvette, '04 Jaguar, '01 Mercedes, and '03 Mercedes. (This is not an exhaustive list).

### III. THE RICO PREDICATE ACTS COMMITTED AGAINST WALSH (AS TO THE COPART CARS)

#### A. Interstate Transportation of Stolen Cars

35. The preceding paragraphs are incorporated herein as though set forth in full.

36. Mitchell's actions violated § 18 U.S.C. § 2312 and § 2313, which state, in pertinent part:

> Whoever transports in interstate or foreign commerce a motor vehicle, vessel, or aircraft, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both.
>
> …
>
> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any motor vehicle, vessel, or aircraft, which has crossed a State or United States boundary after being stolen, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both.

37. These statutes are made RICO predicate acts by 18 U.S.C. § 1961(1).

38. Each of the approximately 20 Copart Cars was stolen from Walsh because Walsh owned them, but Mitchell never delivered these cars to him and concealed their whereabouts. Mitchell also never gave title to Walsh, as he was supposed, nor was Walsh compensated in any way for these vehicles. The Copart Cars were concealed from Walsh despite numerous requests by Walsh to see the vehicles and titles. Thus, each Copart Car stolen from Walsh inflicted a separate injury to him.

39. As described above, Mitchell transported each of the Copart Cars he stole across state lines from Florida, Louisiana, Mississippi, or Washington, D.C., to Maryland. The Copart Cars were either resold to customers by the Defendants without Walsh's knowledge or approval, or were retained by the Defendants, or are otherwise unaccounted for.

40. As part of the Copart Scheme, Mitchell intended to steal these vehicles when he was hired by Walsh to transport the cars from the Copart auction to Walsh in Maryland, and at all other relevant times.

## IV. THE RICO PREDICATE ACTS AGAINST OTHER VICTIMS

41. Mitchell and his co-conspirators have victimized others in the same manner as Walsh, through his corporation, Mitchell Enterprises Xtreme Stat, comprising a ten-year pattern of racketeering activity commencing in 1999 and still ongoing. These other victims include (but are not limited to):

### A. Geico Insurance Company Is A Victim

42. In 1999, in Prince George's County, Maryland, Mitchell attempted to illegally obtain possession of a stolen 1994 Gold Honda Accord by registering a falsified Mechanic's

        Lien on the vehicle. This violated 18 U.S.C. §§ 2312, 2313, which are the same RICO predicate acts committed against Walsh.

43. Mitchell stored and concealed the stolen Gold Honda Civic at Nate's Auto Repair Shop, on U.S. Rt. 1, Cherry Lane, in Laurel, Maryland.

44. The vehicle was originally stolen from an individual in Washington, D.C. on September 4, 1994. After it was reported stolen, Geico Insurance Company, the victim, obtained ownership of the vehicle. The vehicle was valued at approximately $18,000.

45. Mitchell was charged in Maryland state court for theft and unlawful taking of a motor vehicle.

### B.  Ourisman Chevrolet and the Monfridas are Victims

46. In 2000, Mitchell and Amy Sims knowingly obtained a stolen 2000 Chevrolet Malibu (VIN 1G1ND52J4Y6346286). The vehicle was stolen from Ourisman Chevrolet, one of the victims, located in Temple Hills, Maryland.

47. In 2000, Mitchell also purchased a salvaged 2000 Chevrolet Malibu (VIN 1G1ND5217Y6183914) from Jelich. Jelich had purchased the salvaged 2000 Chevrolet Malibu at the Bel-Air Auto Auction.

48. Mitchell and Sims transported the stolen 2000 Chevrolet Malibu from Maryland to Virginia, "re-plated" it with the VIN from the salvaged 2000 Chevrolet Malibu provided by Jelich, and brought the vehicle back to Maryland with a "clean" Virginia title. The Virginia State Police discovered this after Mitchell and Sims titled the vehicle in Virginia in an attempt to conceal its identity.

49. Mitchell and Sims then sold the re-plated stolen 2000 Chevrolet Malibu to Victor and Becky Monfrida, other victims. This violated 18 U.S.C. §§ 2312, 2313, and 2321,[3] RICO predicate acts.

50. The stolen, re-plated 2000 Chevrolet Malibu was seized by the Police. Mitchell and Sims were charged under Maryland law with, *inter alia*, theft and unlawful taking of a motor vehicle. Mitchell pleaded *nolo contendere* and served 30 days in jail.

### V. COUNT I AGAINST WILLIAM MITCHELL FOR VIOLATIONS OF 18 U.S.C. 1962(c)

51. The preceding paragraphs are incorporated herein as though set forth in full.

52. Mitchell violated 18 U.S.C. § 1962(c), as described below.

53. At all relevant times Mitchell Enterprises Xtreme Stat was a corporation operated by Mitchell and his wife Donna Mitchell which affected interstate commerce. As such, it is a RICO enterprise pursuant to 18 U.S.C. § 1961(4).

54. Mitchell is a "person," within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

55. Mitchell committed a pattern of racketeering activity, consisting of repeated and continuous violations of 18 U.S.C. §§ 2312 and 2313, through his participation in Mitchell Enterprises Xtreme Stat. He began his racketeering activity in 1999, and it is still open and ongoing. Mitchell committed all of the above acts of racketeering as a principal in Mitchell Enterprises Xtreme Stat. Additionally, his co-conspirators were directed by him in perpetrating the crimes.

---

[3] 18 U.S.C. § 2321, states, in relevant part: "Whoever buys, receives, possesses, or obtains control of, with intent to sell or otherwise dispose of, a motor vehicle or motor vehicle part, *knowing that an identification number for such motor vehicle or part has been removed, obliterated, tampered with, or altered*, shall be fined under this title or imprisoned not more than ten years, or both." (emphasis added). Like §§ 2312 and 2313, 18 U.S.C. § 2321 is also a RICO predicate act.

56. Each episode of transporting a stolen vehicle at issue here constitutes a separate violation of § 2312 and/or §2313, and therefore a separate RICO violation. Between 1999 and the present, Mitchell committed over 20 RICO violations, the number of vehicles stolen and transported across state lines.

57. Mitchell's violations of §§ 2312 and 2313, enumerated above, in furtherance of the Copart Scheme proximately damaged Walsh in his business or property, pursuant to 18 U.S.C. § 1964(c), in excess of $230,000.00.

58. Walsh suffered damages to the extent he (among other things): (a) purchased Copart Cars that were never titled in his name; (b) purchased Copart Cars that were never returned to him; (c) purchased Copart Cars that were sold by Mitchell without receiving any money for the sales; (d) expended money and labor to repair Copart Cars without receiving the proceeds of any sales; and (e) was deprived of the value and use of these Copart Cars.

59. WHEREFORE, Walsh demands judgment against Mitchell for threefold these damages, his costs and attorney's fees, and an injunction against Mitchell from further RICO violations, dissolution of the enterprise, ordering his divestment of any interests he has in any business entities, and any other relief deemed just, pursuant to 18 U.S.C. § 1964(a). Walsh also requests a jury trial.

### VI. COUNT II AGAINST MITCHELL, DONNA MITCHELL, JELICH, ROGERS, AND SIMS FOR RICO CONSPIRACY

60. The preceding paragraphs are incorporated herein as though set forth in full.

61. Mitchell relied upon Donna Mitchell, Jelich, Rogers, and Sims to cooperate in committing the RICO violations against Walsh, through Mitchell Enterprises Xtreme Stat (the RICO enterprise), as detailed above and below. As such, each of the Defendants violated 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. § 1962(c).

62. As part of the conspiracy, Donna Mitchell assisted Mitchell in arranging transportation, storing, and arranging buyers for Walsh's stolen Copart Cars; she purposely misled Walsh about the illicit nature of the Mitchell's actions so as to conceal the ongoing Copart Scheme; she placed false newsprint and internet advertisements to make it appear that Walsh's vehicles were not yet sold; she submitted false invoices to Walsh; she purposely delayed providing accurate details about the status, location, payment, and sale of the vehicles to hinder Walsh's recovery of either the money or the vehicles; she received title of the stolen Copart Cars in her name; she released title when the Copart Cars were sold; and she used Walsh's stolen Copart Cars for her own personal use.

63. As part of the conspiracy, Jelich assisted Mitchell in transporting, storing, and arranging buyers for Walsh's stolen Copart Cars; he stored titles to Walsh's vehicles at his auto shop; and he used Walsh's stolen vehicles for his own personal use. Additionally, Jelich worked closely with Mitchell in the past and knew that he was a criminal.

64. In June 2006, Walsh told Jelich and Rogers about the Copart Cars, that he [Walsh] purchased the cars at issue, and that he [Walsh] was concerned about recovering his cars from Mitchell. Jelich sarcastically responded, "Good luck with that." Later that day, Mitchell and Jelich discussed a joint venture to purchase real estate together, in which Mitchell would use the money obtained from Walsh's stolen vehicles to purchase his share. Jelich also called Mitchell a "common criminal."

65. As part of the conspiracy, Rogers assisted Mitchell in transporting, storing, and arranging buyers for Walsh's stolen Copart Cars; and he used Walsh's stolen vehicles for his own personal use. Rogers worked closely with Mitchell in the past and knew that he was a criminal.

66. As part of the conspiracy, Sims assisted Mitchell in arranging for transportation and buyers for Walsh's stolen Copart Cars; she purposely misled Walsh about the illicit nature of Mitchell's actions so as to conceal the ongoing Copart Scheme; she falsified information related to the status, sale, and payment of the Copart Cars; she provided Walsh with false information regarding the location of the stolen Copart Cars; she purposely delayed providing accurate details about the status of the Copart Cars to hinder Walsh's recovery of either the money or the vehicles; and she used Walsh's stolen Copart Cars for her own personal use.

67. At all relevant times, the Mitchells, Jelich, Rogers, and Sims knew that the Copart Cars in question were stolen.

68. As a direct and proximate result of and by reason of their agreement with Mitchell to commit the RICO predicate acts alleged through Mitchell Enterprises Xtreme Stat, Walsh has been injured in his business or property, within the meaning of 18 U.S.C. § 1964(c), in an amount in excess of $230,000.000, the amount of money that he paid for the purchase and repair of the Copart Cars.

69. Walsh suffered damages to the extent he (among other things): (a) purchased Copart Cars that were never titled in his name; (b) purchased Copart Cars that were never returned to him; (c) purchased Copart Cars that were sold by Mitchell without receiving any money for the sales; (d) expended money and labor to repair Copart Cars without receiving the proceeds of any sales; and (e) was deprived of the value and use of these Copart Cars.

70. WHERFORE, Walsh is entitled to recover against Mitchell, Donna Mitchell, Jelich, Rogers, and Sims threefold his damages sustained, with costs, and attorneys' fees, and an injunction against the Defendants from further RICO violations, dissolution of the

enterprise, ordering their divestment of any interest they have in any business entities, and any other relief deemed just, pursuant to 18 U.S.C. §1964(a).  Mitchell, Donna Mitchell, Jelich, Rogers, and Sims are jointly and severally liable for all damages.  Walsh also requests a jury trial.

### VII. COUNT III AGAINST MITCHELL, DONNA MITCHELL, JELICH, ROGERS, AND SIMS FOR CONSPIRACY TO COMMIT TROVER AND CONVERSION

71. The preceding paragraphs are incorporated herein as though set forth in full.

72. The Mitchells agreed to assist in the sale of the Copart Cars paid for and owned by Walsh.

73. Sims, Rogers, and Jelich agreed to assist the Mitchells in receiving and/or removing the Copart Cars owned by Walsh.

74. Walsh demanded the return of his property or the alternate value of the property, but the Mitchells refused Walsh's demands. The Defendants' retention of the vehicles was intentional, without justification, and constituted conversion of Walsh's property.

75. WHEREFORE, Walsh demands judgment against the Defendants for compensatory damages in excess of $230,000.00 with interest and costs, punitive damages, and such other relief as this Court may deem proper.  Walsh also requests a jury trial.

### VIII. COUNT IV AGAINST MITCHELL AND DONNA MITCHELL FOR BREACH OF CONTRACT

76. The preceding paragraphs are incorporated herein as though set forth in full.

77. The Mitchells individually and jointly were engaged in the business of buying, selling and repairing automobiles.

78. Walsh entered into a contract with the Mitchells regarding the sale of the Copart Cars. Pursuant to a contract, the Mitchells were supposed to arrange for buyers to purchase Walsh's Copart Cars. If the Mitchells were successful, Walsh would split the profits of the sale. Walsh had sole authority over any sale.

79. The Mitchells subsequently disposed of the Copart Cars without authorization from Walsh and without compensating Walsh in any way.

80. Walsh demanded payment under the terms of the contract and the Mitchells refused and/or failed to pay, thus materially breaching the contract with Walsh.

81. As a result of their breach, Walsh incurred damages in excess of $230,000.

82. WHEREFORE, Walsh demands judgment against the Mitchells jointly and severally for more than $230,000 with interest and cost, punitive damages, and for such other relief as the Court may direct. Walsh also requests a jury trial.

### IX. COUNT V AGAINST MITCHELL AND DONNA MITCHELL FOR BREACH OF FIDCUIARY DUTY

83. The preceding paragraphs are incorporated herein as though set forth in full.

84. As detailed above, the Mitchells and Walsh entered into a partnership for the sale of the Partnership Cars. Pursuant to the Maryland Revised Uniform Partnership Act, Title 9A-101 *et. seq.*, the Mitchells and Walsh owed a fiduciary duty to one another.

85. By stealing the Partnership Cars, failing to account for the Partnership Cars' sales, location and/or transportation, and by deliberately impeding Walsh's ability to account for said actions, as detailed above, the Mitchells violated their fiduciary duty to Walsh.

86. WHEREFORE, Walsh demands the following relief against the Mitchells: an accounting of profits, losses, and costs; reimbursement for costs and payments; a constructive trust; punitive damages; and any other equitable relief the Court deems proper.

## X.  COUNT VI AGAINST MITCHELL, DONNA MITCHELL, JELICH, ROGERS, AND SIMS FOR CIVIL CONSPIRACY

87. The preceding paragraphs are incorporated herein as though set forth in full.

88. Defendants Mitchell, Donna Mitchell, Jelich, Rogers, and Sims entered into an agreement to wrongfully take and use the Copart Cars purchased by Walsh.

89. Without the consent or approval of Walsh, on or about February 2006 and thereafter, Defendants unlawfully transferred, utilized and/or sold automobiles and automobile parts purchased by Walsh.

90. As a result of the Defendants' conspiracy to acquire and dispose of automobile and automobile parts, Walsh was damaged, including severe economic injury, loss profits and other compensatory damages totaling more than $230,000.

91. WHEREFORE Plaintiff demands judgment against the Defendants Mitchell, Donna Mitchell, Jelich, Rogers, and Sims, who are jointly and severally liable for compensatory damages of more than $230,000, plus interest, punitive damages, and costs.  Walsh also requests a jury trial.

## XI.  COUNT VII AGAINST JELICH, ROGERS, AND SIMS FOR UNJUST ENRICHMENT

92. Walsh did not enter into a contract or partnership with Defendants Jelich, Rogers, or Sims.

93. Jelich, Rogers, and Sims used Walsh's Copart Cars for their own personal use without compensating Walsh.  This was a benefit for which they were not entitled.

94. The acceptance or retention by these Defendants of the benefit under the circumstances makes it inequitable for them to retain the benefit without payment for its value.

95. WHEREFORE, Plaintiff demands judgment against Defendants Jelich, Rogers, and Sims for the value of the use of Walsh's vehicles and any other equitable relief the Court deems proper.

### XII. COUNT VIII AGAINST MITCHELL FOR ASSAULT AND BATTERY

96. On May 22, 2007 Mitchell threatened and assaulted Walsh by ejecting him from the Mitchells' place of business. At all times relevant hereto, Mitchell acted with the intent and did do bodily harm to Walsh. Mitchell's conduct was perpetuated with actual malice and caused Walsh to be put into reasonable apprehension for his life. Mitchell also left threatening voicemails regarding the same.

97. Mitchell also made threatening racial comments saying, "You White Mother Fucker, come over to my shop and I will take care of you!" and "You white people if you had anything on me [Mitchell] you [Walsh] would have done something a long time ago."

98. At the same time and place aforesaid, Mitchell violently struck the Plaintiff. Defendant Mitchell's actions constituted an intentional touching which was of a non-consensual nature and was undertaken deliberately and which constitutes actual malice.

99. As a result of Mitchell's conduct, Walsh sustained substantial damages including, but not limited to, extreme pain and suffering, physical injuries including but not limited to back, neck, head and shoulders, humiliation, mental distress and monetary losses.

100. WHEREFORE, Walsh demands judgment against Defendant William Mitchell of an amount in excess of $75,000.00 in compensatory damages and $100,00.00 punitive damages with interest and cost. Walsh also requests a jury trial.

### XIII. COUNT IX AGAINST THE DEFENDANTS FOR CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION

101. The preceding paragraphs are incorporated herein as though set forth in full.

#### A. Fraudulent Misrepresentation Regarding the Copart Cars

102. In January 2006, Mitchell told Walsh that he had a retail license to sell vehicles in Maryland, when in fact, Mitchell only had a wholesale license.

103. This statement constituted a false representation of a material fact.

104. When Mitchell made this statement, he knew it to be false.

105. Mitchell made this false representation for the purpose, desire, and intent of inducing Walsh to allow Mitchell to transport, repair, and sell the Copart Cars on Walsh's behalf (and act as Walsh's sales agent). This would allow Mitchell and his co-conspirators to steal Walsh's Copart Cars.

106. Additionally, this false representation was made to induce Walsh to purchase additional Copart Cars that he would not have otherwise purchased, thus allowing Mitchell and his co-conspirators to steal even more Copart Cars from Walsh.

107. Mitchell's statement was also made with the purpose, desire, and intent to further the Copart Scheme described above.

108. Mitchell made this statement on behalf of all the other Defendants, who had agreed to defraud Walsh of the Copart Cars.

109. Walsh had no reason to know that this statement was false.

110. If Mitchell had informed Walsh that he did not have a retail license to sell vehicles in Maryland, Walsh would have never allowed Mitchell to transport, repair, and sell the Copart Cars on his behalf, and Walsh's Copart Cars would never have been stolen. Additionally, if Mitchell had informed Walsh that he did not have a retail license to sell

vehicles in Maryland, Walsh would have never purchased a majority of the Copart Cars that were later stolen by Mitchell. Walsh would have purchased far fewer.

111. At all relevant times, Donna Mitchell, Jelich, Rogers, and Sims knew about and agreed to Mitchell's intentional misrepresentation to Walsh regarding the Copart Cars. Each of the Defendants agreed to assist Mitchell in defrauding Walsh by hiding and concealing the whereabouts of the Copart Cars.

112. As a direct result of these misrepresentations, Walsh suffered damages in excess of $230,000, the value of the Copart Cars that Mitchell stole from him.

### B. Fraudulent Misrepresentation Regarding the Partnership Cars

113. On or about March 10, 2006, the Mitchells falsely represented that they were purchasing used cars, pursuant to the Partnership Scheme.

114. On March 11, 2006 and April 5, 2006, the Mitchells faxed to Walsh a list of used cars Mitchell was supposedly purchasing pursuant to the Partnership Scheme. The list included (but was not limited to): '01/'04 Jaguar, '05 Chrysler, '01 GMC Yukon, '03 Corvette, two '01 Corvettes, '01 Mercedes, '97 Ford, '01 Dodge, '66 Mercedes, '91 Ford, two '01 Saturns, '01 Mazda, '99 BMW, '00/'02 Cadillac, and '01 BMW.

115. At no time did the Mitchells ever intend to actually purchase any Partnership Cars.

116. These false representations were made to Walsh for the sole purpose, desire, and intent of stealing his money, as part of the Partnership Scheme.

117. The Mitchells made these false statements on behalf of all the other Defendants, who had agreed to defraud Walsh of the Partnership Cars and/or value of the Partnership Cars.

118. These statements therefore constituted false representations of material facts.

119. At all relevant times, Jelich, Rogers, and Sims knew of, and agreed to, the Mitchells' intentional misrepresentations to Walsh regarding the Partnership Cars. Each of the Defendants agreed to assist in defrauding Walsh by hiding and concealing the whereabouts of these allegedly purchased Partnership Cars.

120. If Walsh had known that these statements and representations were false, he would never have paid the Mitchells approximately $46,000.

121. As a direct result of these misrepresentations, Walsh suffered damages in excess of $46,000, the amount of money he paid to the Mitchells for "Partnership Cars" that were never actually purchased.

122. WHEREFORE, Walsh demands judgment against the Defendants for compensatory damages in excess of $275,000, plus with interests, costs, and punitive damages, and such other relief to as this Court may deem proper.

Dated:  October 6, 2009                    Respectfully submitted,

/s/ William J. Howard
Bar No. 25381
Howard & Marcus
4316 Hamilton Street
Hyattsville, MD 20781
(301) 864-6700

Howard W. Foster
Matthew A. Galin
Touhy, Touhy, Buehler & Williams, LLP
55 West Wacker Drive, 14th Floor
Chicago, Illinois  60601
(312) 372-2209

## **CERTIFICATE OF SERVICE**

      I, William Howard, an attorney, state that I caused the foregoing document to be served upon all counsel of record via electronic delivery by CM/ECF and upon Amy Sims and Dennis Rogers via U.S. Mail on this the 6th day of October, 2009.

Amy Sims
23372 Hurry Road
Avenue, Maryland  20609

Dennis Rogers
8321 Stanwood Street
New Carrolton, Maryland  20748

                                      /s/ William J. Howard
                                      Bar No. 25381
                                      Howard & Marcus
                                      4316 Hamilton Street
                                      Hyattsville, MD 20781
                                      (301) 864-6700