IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID WALSH      :

           :

 v.        : Civil Action No. DKC 08-1897

           :

WILLIAM MITCHELL, et al.  :

           :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case involving alleged civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and related state law claims are motions to dismiss filed by Defendants John Jelich (paper 64), Dennis Rogers (paper 70), William and Donna Mitchell (paper 72), and Amy Sims (paper 77). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendants' motions will be granted.

**I. Background**

Unless otherwise indicated, the following facts are set forth in Plaintiff's second amended complaint (paper 60) and relate exclusively to the first count, alleging substantive RICO violations against Defendant William Mitchell.[1] Following

---

[1] At the conclusion of a September 22, 2009, motions hearing, the court granted a motion to dismiss Plaintiff's first amended complaint without prejudice to his right to amend to

Hurricane Katrina, a large number of car owners filed automobile insurance claims related to damage sustained to their vehicles during the storm. In settling these claims, policyholders were frequently required to transfer title to their insurers in exchange for benefits. The insurance companies, in turn, attempted to sell these used and damaged vehicles on the wholesale automobile market, thereby resulting in a glut of inventory in the Gulf Coast region. This created an opportunity for buyers with access to wholesale auctions to purchase these cars at low prices.[2]

Plaintiff David Walsh sought to take advantage of this opportunity. In early January 2006, after purchasing several of these vehicles for personal use through acquaintances who were licensed dealers, he discussed with Defendant William Mitchell the possibility of buying additional cars for investment

---

address certain deficiencies in the RICO counts. In so doing, the court cautioned that if it were to dismiss Plaintiff's amended RICO claims finally, it would not consider the merits of the pendent state law claims; rather, "the state law claims w[ould] be dismissed for re-filing in [s]tate [c]ourt." (Paper 71, at 27). Because the court will find that the RICO counts of the second amended complaint cannot be sustained, the facts upon which the remaining claims rely will not be set forth.

[2] In his initial complaint, Plaintiff explained that "[o]nly licensed auto dealers" were able to "bid on and buy cars" at wholesale auctions. (Paper 1, ¶ 6). Plaintiff "was not a licensed car dealer, which precluded him from buying used cars at auction houses," but he "made contact with some car dealer acquaintances who agreed to submit auction bids on [his] behalf." (*Id*. at ¶ 15).

purposes. Mr. Mitchell and his wife, Defendant Donna Mitchell (together, "the Mitchells"), were principals of Mitchell Enterprises Xtreme Stat ("Xtreme"), "a corporation . . . which affected interstate commerce" and had a license to purchase vehicles on the wholesale automobile market. (*Id*. at 53). Significantly, for purposes of the RICO counts, Xtreme had an account with Copart, Inc. ("Copart"), a national wholesale auction house, which allowed it to bid on vehicles at Copart auctions.

On February 22, 2006, Plaintiff and Mr. Mitchell entered into a contract for Mr. Mitchell to "act as [Plaintiff's] agent in transporting and selling" vehicles purchased by Plaintiff at Copart auctions through Xtreme's Copart account. (*Id*. at ¶ 16). Plaintiff recites the terms of the oral contract as follows:

> Walsh paid Mitchell $5,000 for the right to use Mitchell Enterprises Xtreme Stat's (Mitchell's Corporation) Copart (and/or other vendor) login ID/password in order for Walsh to personally bid on used vehicles (from February 2006 through June 30, 2006) located in Florida, Louisiana, Mississippi, and Washington, D.C. If a bid was successful, then Walsh would wire the purchase price from his personal Bank of America account to the Copart account (or other vendors as applicable) to purchase the vehicle(s). Then, Walsh would pay Mitchell a fee to transport (or arrange for transport [of]) Walsh's Copart Cars from the auction site (always out of state) to Walsh in Maryland. If requested by Walsh, Walsh would also pay Mitchell a fee to perform minor repair work on each vehicle he had

> transported to Maryland. Mitchell would
> then act as Walsh's sales agent to try to
> sell Walsh's Copart Cars because Mitchell
> claimed to have buyers lined up. To the
> extent that Mitchell could successfully sell
> a Copart Car, Walsh would obtain the money
> from the sale and then split the profits
> with Mitchell, if any.

(*Id*. at ¶ 16). Under this contract, Plaintiff was to be the sole owner of each of the vehicles purchased; he had an immediate right to possession; and he had "sole authority for determining whether his Copart Cars were sold, who they were sold to, and/or whether he . . . would retain possession and title." (*Id*. at ¶ 18).

According to Plaintiff, unbeknownst to him at the time of the contract, Mr. Mitchell was a "career criminal with a history of theft" who "saw [Plaintiff] as an opportunity to steal more cars." (*Id*. at ¶ 14). He cites two prior incidents in support of this claim. The first incident occurred in 1999 when Mr. Mitchell "attempted to illegally obtain possession of a stolen 1994 Gold Honda Accord by registering a falsified Mechanic's Lien on the vehicle," which he "stored and concealed" at an auto repair shop in Laurel, Maryland. (*Id*. at ¶¶ 42, 43). This car was "originally stolen from an individual in Washington, D.C. on September 4, 1994," and, thereafter, Geico Insurance Company "obtained ownership" prior to the time Mr. Mitchell took possession. (*Id*. at ¶ 44). According to Plaintiff, criminal

charges were filed against Mr. Mitchell in Maryland state court related to this conduct. The second incident occurred in 2000 when Mr. Mitchell and Defendant Amy Sims "knowingly obtained a stolen 2000 Chevrolet Malibu" that was owned by Ourisman Chevrolet, in Temple Hills, Maryland. (*Id*. at ¶ 46). At around the same time, Mr. Mitchell separately purchased a salvaged 2000 Chevrolet Malibu from Defendant John Jelich. Mr. Mitchell and Ms. Sims then transported the stolen Malibu from Maryland to Virginia, substituted the VIN from the salvaged Malibu, titled the stolen vehicle in Virginia, and sold it to Victor and Becky Monfridas. The vehicle was ultimately seized by police and Mr. Mitchell and Ms. Sims were criminally charged in state court with theft-related offenses. Mr. Mitchell entered a plea of *nolo contendre* and served a short term of incarceration.

Under the contract between Plaintiff and Mr. Mitchell, between February 22 and June 30, 2006, Plaintiff successfully bid on approximately twenty Copart vehicles and deposited $230,000 into Xtreme's Copart account for their purchase. Mr. Mitchell, however, failed to transport the cars from the auction sites to Plaintiff's home or other locations designated by Plaintiff. Instead, he took possession of the vehicles at the auction sites and transported them, across state lines, to various undisclosed locations in Maryland. Thereafter, with the assistance of the remaining defendants, Mr. Mitchell either sold

the vehicles and kept all proceeds or simply retained possession. None of the vehicles were ever titled in Plaintiff's name; rather, they were titled in the name of Ms. Mitchell, who transferred title to any subsequent buyers. Plaintiff alleges that "[a]t all relevant times during their relationship, [Mr.] Mitchell intended to steal the Copart Cars from [him]." (*Id.* at ¶ 23).

On July 22, 2008, Plaintiff commenced this action alleging RICO violations and related state law claims against the Mitchells and Mr. Jelich. (Paper 1). Prior to the time any responsive pleading was filed, Plaintiff amended his complaint, adding Dennis Rogers and Amy Sims as defendants and alleging a RICO conspiracy count against all defendants. (Paper 23). Several of the defendants moved to dismiss and, on September 22, 2009, a hearing was held to address these and other pending motions. At the conclusion of that hearing, the court granted the Mitchells' motion to dismiss without prejudice to Plaintiff's right to file a second amended complaint within fourteen days. (Paper 59).[3]

---

[3] In his first amended complaint, Plaintiff alleged that he and Mr. Mitchell entered into a partnership for the purchase, transport, repair, and sale of vehicles damaged by Hurricane Katrina at wholesale auctions; that the vehicles were to be "jointly owned by the two partners" (paper 71, motions hearing transcript, at 14); and that Plaintiff would advance to Mr. Mitchell the capital to purchase the cars at auction and Mr. Mitchell would then transport them to Maryland, repair and sell

Plaintiff filed his second amended complaint on October 6, 2009. (Paper 60). On October 19, Mr. Jelich filed a motion to dismiss arguing, *inter alia*, that Plaintiff had again failed to state a claim for violations of RICO. (Paper 65). Mr. Rogers advanced similar arguments in a dismissal motion filed one week later (paper 70), as did the Mitchells (paper 72) and Ms. Sims (paper 77) in subsequent *pro se* submissions.[4]

## II.  **Standard of Review**

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a

---

them, and both parties would split the profits. At the motions hearing, the court ruled that, under those facts, Plaintiff could not establish that the vehicles were "stolen" at the time they were transported across state lines, as necessary to establish violations of the Dyer Act, the RICO predicate offenses.

In his second amended complaint, Plaintiff distinguishes the dealings concerning the twenty Copart vehicles, which he refers to as "The Copart Scheme," from those related to additional vehicles purchased pursuant to a second agreement, called "The Partnership Scheme," Plaintiff clarifies, "are the subject of [his] RICO claims" (paper 60, ¶ 24), while the twenty-two cars purchased pursuant to "The Partnership Scheme" are not (*id*. at ¶ 26).

[4] On December 8, 2009, Plaintiff moved for leave to file a surreply to address alleged "new arguments" raised by Mr. Jelich and the Mitchells in their reply briefs "regarding partnership law." (Paper 88, at 1). Assuming, *arguendo*, that these arguments are novel, the court will not consider them in deciding the instant motions. Accordingly, Plaintiff's motion for leave to file a surreply will be denied.

plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2). Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n. 3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).

In its determination, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir.

1979).  *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"  *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

## III. Analysis

Plaintiff asserts two claims for violations of RICO's civil provision, 18 U.S.C. § 1964, which provides a cause of action to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."  The first count of his second amended complaint alleges substantive RICO violations by Mr. Mitchell under 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  In the second count, Plaintiff asserts, pursuant to 18 U.S.C. § 1962(d), that Defendants conspired to violate § 1962(c).

To state a claim for a substantive violation of RICO, the complaint must set forth facts which, if proven, would establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Several of the operative terms are defined by statute. "Enterprise," as set forth by 18 U.S.C. § 1961(4), "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The same statute defines "racketeering activity," in relevant portion, as "any act which is indictable" under a number of enumerated criminal provisions. 18 U.S.C. § 1961(1). A "pattern of racketeering activity," moreover, "requires at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

Here, the complaint asserts that Xtreme, the corporation of which the Mitchells were principals, was, at all times relevant, "a RICO enterprise pursuant to 18 U.S.C. § 1961(4)." (Paper 60, ¶ 53). It further states that Mr. Mitchell, through Xtreme, "committed a pattern of racketeering activity, consisting of repeated and continuous violations of 18 U.S.C. §§ 2312 and

2313," and that "[h]e began his racketeering activity in 1999, and it is still open and ongoing." (*Id*. at ¶ 55). More specifically, Plaintiff alleges that "[e]ach episode of transporting a stolen vehicle at issue here constitutes a separate violation of § 2312 and/or § 2313," and "[b]etween 1999 and the present, [Mr.] Mitchell [with the assistance of the other defendants] committed over 20 RICO violations, the number of vehicles stolen and transported across state lines." (*Id*. at ¶ 56).

In moving to dismiss the second amended complaint, Defendants advance three arguments: (1) that the complaint fails to establish that the vehicles at issue were "stolen" at the time they crossed state lines; (2) that the facts establish that Plaintiff's money, not the cars, was stolen; and (3) that Plaintiff has failed to allege a pattern of racketeering activity, as required to sustain his RICO claims. As such, Defendants contend that the RICO claims must be dismissed and that the court should decline to exercise supplemental jurisdiction over the remaining state law claims.[5]

---

[5] The papers submitted by Defendants, many of whom are either currently *pro se* or have been at some point during these proceedings, liberally borrow from each other and from a prior memorandum submitted by former counsel for the Mitchells in successfully moving for dismissal of the first amended complaint. The arguments they advance in support of dismissal are identical.

**A. Sufficiency of the Predicate Offenses**

The "racketeering activity," or predicate offenses, alleged by Plaintiff involve multiple violations of the Dyer Act, also known as the National Motor Vehicle Theft Act, 18 U.S.C. §§ 2312 and 2313. Pursuant to § 2312, "[w]hoever transports in interstate commerce or foreign commerce a motor vehicle, vessel, or aircraft, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both." Section 2313 imposes the same penalty upon a person who "receives, possesses, stores, barters, sells, or disposes of any motor vehicle . . . which has crossed a State or United States boundary after being stolen, knowing the same to have been stolen." Any violation of these provisions constitutes a RICO predicate under 18 U.S.C. § 1961(1).

To establish a violation of § 2312, it must be shown that "(1) there was a stolen vehicle; (2) the defendant knew that the vehicle was stolen; and (3) the defendant transported the vehicle in interstate commerce." *United States v. Spoone*, 741 F.2d 680, 686 (4th Cir. 1984) (citing *United States v. Martinez*, 694 F.2d 71, 72 (5th Cir. 1982); *United States v. Johnson*, 526 F.2d 600, 601 (8th Cir. 1975) (per curiam)). Here, it is undisputed that the vehicles at issue were transported in interstate commerce. Defendants contend, however, that because Mr. Mitchell was authorized under the alleged contract to take

possession of the Copart vehicles from the auction sites in the Gulf Coast region and transport them to Maryland, the cars could not have been "stolen" at the time they crossed state lines. While the court found this argument persuasive under the facts alleged in Plaintiff's first amended complaint, the second amended complaint has, at least facially and arguably, cured the deficiencies of its predecessor in this regard.

The primary point of contention between the parties concerns the meaning of the term "stolen" in the context of the Dyer Act. The Supreme Court of the United States addressed this issue in *United States v. Turley*, 352 U.S. 407 (1957). In that case, the defendant was charged with violating the Act where he borrowed the car of an acquaintance, with permission to use it for a specific purpose, and transported it across state lines and sold it without the owner's consent. The district court granted the defendant's motion to dismiss the information, agreeing that the term "stolen," as used in the Dyer Act, referred only to takings that constitute common-law larceny, which the conduct in question did not. The Government appealed directly to the Supreme Court, which reversed and remanded.

Throughout the legislative history of the Act, the Court explained, "Congress used the word 'stolen' as synonymous with 'theft,' a term generally considered to be broader than '[common-law] larceny.'" *Turley*, 352 U.S. at 414. The Court

13

further noted that the term "larceny" "carries no necessary implication excluding the taking of automobiles by embezzlement or false pretenses," and that "[p]ublic and private rights are violated to a comparable degree whatever label is attached to the felonious taking." *Id.* at 415-16. Reasoning that "[p]rofessional thieves resort to innumerable forms of theft" and that "Congress presumably intended to meet the need for federal action effectively rather than to leave loopholes for wholesale evasion," the Court held that "'[s]tolen' as used in 18 U.S.C. § 2312, includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *Id.* at 416-17.

Consistent with the interpretation set forth in *Turley*, the Fourth Circuit has broadly construed what constitutes a "stolen" vehicle for purposes of the Act. *See United States v. Oates*, 314 F.2d 593, 594 (4th Cir. 1963) ("the word 'stolen,' as used in the National Motor Vehicle Theft Act[,] . . . includes all takings of motor vehicles with criminal intent to deprive the rightful owner of the rights and benefits of ownership"); *United States v. Welborn*, 322 F.2d 910, 912 (4th Cir. 1963) ("the Dyer Act covers both larceny by trick, where the intent to steal is present at the time of the rental, and embezzlement, where the

intent to steal arises at some later time, as long as the car was subsequently transported in interstate commerce").

Under this liberal interpretation, Plaintiff has alleged facts sufficient to establish that the Copart vehicles, transported either by Mr. Mitchell or other defendants under his direction, were "stolen" within the meaning of the Dyer Act. Mr. Mitchell failed to deliver each of the twenty Copart vehicles according to Plaintiff's specifications, and he did not title them in Plaintiff's name, as he was required to do under the contract. Instead, the cars were titled in the name of Ms. Mitchell – reflecting the intent to deprive Plaintiff of possession at the auction sites – and were driven to undisclosed locations from which Mr. Mitchell attempted to sell them without sharing the proceeds with Plaintiff. Insofar as Plaintiff now alleges that Mr. Mitchell was his agent, authorized to take possession of the vehicles and deliver them to specific locations, the instant facts are similar to those presented in cases where Dyer Act convictions have been sustained against defendants who failed to return rental cars that were driven across state lines. *See, e.g., United States v. Dillinger*, 341 F.2d 696, 697 (4th Cir. 1965) (explaining that the word "stolen" under the Dyer Act "encompasses any taking with the intention to convert the vehicle to the use of the taker and wrongfully deprive the owner of his possessory rights and the benefits of

the ownership," and may occur where "possession is acquired by means of a rental agreement"). Plaintiff has alleged that Mr. Mitchell intended to steal the vehicles "[a]t all relevant times during their relationship" (paper 60, ¶ 23), and the facts clearly show that he deprived Plaintiff of his right to possess and enjoy them.

Furthermore, Plaintiff has set forth sufficient facts demonstrating that the cars, rather than Plaintiff's money, were stolen. In his second amended complaint, Plaintiff clarifies that he contracted with Mr. Mitchell to use Xtreme's Copart account for the purpose of bidding on the vehicles at auction. When a bid was successful, he deposited the purchase funds directly into the account and they were withdrawn by Copart. Thus, the money was not paid to Mr. Mitchell, as previously alleged, such that he could have simply absconded with the purchase funds without buying the vehicles.

Thus, the RICO counts cannot be dismissed for failure to allege predicate offenses.

### B. Pattern of Racketeering Activity

As the Fourth Circuit explained in *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989):

> The "pattern" requirement is more than incidental to the operation of the RICO statute. In providing a remedy of treble damages for injury "by reason of a violation of" RICO's substantive provisions, 18 U.S.C.

§ 1964(c), Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences. *See* S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969) U.S.Code Cong. & Admin.News ("One isolated 'racketeering activity' was thought insufficient to trigger the remedies provided under the proposed chapter, largely because the net would be too large and the remedies disproportionate to the gravity of the offense."); 116 Cong.Rec. 35193 (1970) (RICO "not aimed at isolated offender") (statement of Rep. Poff). The pattern requirement in § 1961(5) thus acts to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions such as this one are not eclipsed or preempted.

To allege a pattern of racketeering activity, a plaintiff must show that at least two predicate acts occurred within ten years of each other, 18 U.S.C. § 1961(5), that the acts were related, and that they "amount to or pose a threat of continued criminal activity," *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*. at 240 (quoting *Sedima*, 473 U.S. at 496 n. 14). As to the continuity element, the Fourth Circuit has explained:

> Continuity . . . refers "either to a closed period of *repeated* conduct, or to

> past conduct that by its nature projects
> into the future with a threat of
> *repetition*." [*H.J. Inc*., 492 U.S. at 242]
> (emphasis added). To satisfy the continuity
> element, a plaintiff must show that "the
> predicates themselves amount to, or . . .
> otherwise constitute a threat of, *continuing*
> racketeering activity." *Id*. at [240]
> (emphasis in original). Significantly,
> "[p]redicate acts extending over a few weeks
> or months and threatening no future criminal
> conduct do not satisfy this requirement:
> Congress was concerned in RICO with long-
> term criminal conduct." *Id*. at [242]. . . .
> Thus, predicate acts must be part of a
> prolonged criminal endeavor.

*Menasco, Inc.*, 886 F.2d at 683-84.

Plaintiff alleges that Mr. Mitchell, through Xtreme, "committed a pattern of racketeering activity, consisting of repeated and continuous violations of 18 U.S.C. §§ 2312 and 2313," and that "[h]e began his racketeering activity in 1999, and it is still open and ongoing." (Paper 60, ¶ 55). To establish the starting point for this time frame, Plaintiff relies on the allegations of the incidents occurring in 1999, when Mr. Mitchell allegedly "stored and concealed" a vehicle he knew to be stolen (*id*. at ¶ 43), and 2000, when he transported a stolen vehicle from Maryland to Virginia. These prior incidents, however, are not sufficiently related to the vehicles "stolen" in "The Copart Scheme." Plaintiff asserts, in conclusory fashion, that these acts were conducted "through [Mr. Mitchell's] corporation," Xtreme, but he fails to explain the

manner in which the alleged enterprise was involved, separate and apart from the individual acts of Mr. Mitchell. *See Benard v. Hoff*, 727 F.Supp. 211, 214 (D.Md. 1989) ("Whatever relationship between defendant and enterprise is relied on to state a RICO claim, . . . the required relationship is a participation of both a RICO defendant *and* an enterprise as two separate persons." (emphasis in original)); *Gussin v. Shockey*, 725 F.Supp. 271, 277 (D.Md. 1989) (finding allegations "not sufficient to engage the protections of RICO" in the absence of "some intended nexus between the defendant and the enterprise undertaken to violate the statute"). Although Mr. Mitchell's alleged conduct in 1999 and 2000 may constitute violations of the Dyer Act, "Plaintiff presents no evidence that these actions were part of an overall illegal scheme sanctionable under RICO." *Davis v. Hudgins*, 896 F.Supp. 561, 569 (E.D.Va. 1995). "[T]he lack of any clear and distinct relationship between the alleged acts defeats a component necessary for liability under RICO, specifically that the acts were related to one another and formed the basis of a pattern of racketeering activity." *Davis*, 896 F.Supp. at 569.

Plaintiff's allegation that a pattern of racketeering activity is "still open and ongoing" is also problematic. The basis of this conclusory assertion is unclear, and the complaint offers no specific facts in support. *See Francis*, 588 F.3d at

193 ("'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief" (quoting *Twombly*, 550 U.S. at 557)). Thus, this allegation "cannot be relied upon to show a continuing pattern of fraudulent acts." *Menasco, Inc.*, 886 F.2d at 684.

Distilled to its core, the only potentially viable pattern of racketeering activity alleged by the second amended complaint relates to the theft of the twenty vehicles purchased at Copart auctions pursuant to the contract between Plaintiff and Mr. Mitchell. (Paper 60, ¶ 16). It is undisputed that these acts satisfy the relatedness prong of RICO's pattern requirement. They fail, however, to satisfy the continuity element.

For purposes of a close-ended scheme, such as that alleged here, the continuity requirement is established by alleging a "series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. While there is no bright line rule as to what constitutes a "substantial period of time," the *H.J. Inc.* Court explained that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id*. The Fourth Circuit has adopted a "case-by-case, fact specific approach in determining whether the continuity requirement is

met," considering factors such as "the number and variety of predicate acts, the length of time over which they were committed, the number of putative victims[,] the presence of separate schemes, and the potential of multiple distinct injuries." *Park v. Jack's Food Systems, Inc.*, 907 F.Supp. 914, 920 (D.Md. 1995) (citing *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1988)).

Plaintiff alleges that the oral contract between him and Mr. Mitchell was entered on February 22, 2006, and authorized him to bid on vehicles through Xtreme's Copart account until June 30, 2006. (Paper 60, ¶ 16). Assuming that Mr. Mitchell drove the vehicles from the auction sites to Maryland within that time frame, or shortly thereafter, the scheme could have been in place for no more than five months. Courts in this circuit have routinely found that schemes extending over significantly longer periods of time failed to meet the continuity requirement. *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 550-51 (4th Cir. 2001) (finding that a two-year pattern of fraud did not "present the type of persistent, long-term fraudulent conduct" to which RICO was intended to apply); *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (finding no pattern where the defendant's conduct took place over seven years); *cf. Walk v. Baltimore & Ohio R.R.*, 890 F.2d 688, 690 (4th Cir. 1989)

(continuity established by ten-year duration of fraudulent conduct); *Morley v. Cohen*, 888 F.2d 1006, 1010 (4th Cir. 1989) (five-year duration of fraudulent conduct established continuity). Moreover, the scheme at issue here existed for the sole purpose of stealing vehicles from a single victim, namely Plaintiff. "In the face of allegations of far more widespread racketeering than alleged here, [the Fourth Circuit has] held that no pattern of racketeering activity existed and that plaintiffs must seek recourse outside the RICO statute." *Menasco, Inc.*, 886 F.2d at 685 (citing, *inter alia*, *International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149 (4th Cir. 1987); *Brandenburg*, 859 F.2d 1179). Finally, aside from conclusory allegations, there is nothing in Plaintiff's second amended complaint suggesting a threat of continuing future conduct by the alleged enterprise. To the contrary, "The Copart Scheme" related to a specific investment opportunity – *i.e.*, the glut of used vehicles on the wholesale automobile market following Hurricane Katrina – that has now passed and a finite contract that expired in June 2006.

Courts considering schemes that were of short duration, involving a narrow focus, a single victim, and posing no threat of continuing future criminal activity, have consistently found that that no pattern of racketeering activity was established. *See, e.g., Lowry's Reports, Inc. v. Legg Mason, Inc.*, 186

22

F.Supp.2d 592, 593 (D.Md. 2002). For these reasons, Plaintiff's second amended complaint fails to allege the required pattern. Accordingly, his substantive RICO claim against Mr. Mitchell will be dismissed. Because he has failed to state a claim under § 1962(c), his "charge of conspiracy to violate RICO pursuant to § 1962(d) is also without merit." *Foster v. Wintergreen Real Estate Co.*, 363 Fed.Appx. 269, 275 (4th Cir. 2010) (citing *GE Inv. Private Placement Partners II*, 247 F.3d at 551 n.2). Because neither of the RICO claims can be sustained, the court will decline to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).[6]

## IV. Conclusion

For the foregoing reasons, Defendants' motions to dismiss will be granted. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[6] Plaintiff will be free to raise these claims in an appropriate state court. Maryland Rule 2-101(b) protects plaintiffs from any limitations bar that may have arisen while the action was pending in this court.